# 324 LIQUOR CORP., DBA YORKSHIRE WINE & SPIRITS v. DUFFY ET AL.

No. 84–2022.   Argued November 3, 1986—Decided January 13, 1987

POWELL, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, STEVENS, and SCALIA, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 352.

*Bertram M. Kantor* argued the cause for appellant. With him on the briefs were *Michael H. Byowitz* and *Seymour Howard.*

*Deputy Assistant Attorney General Cannon* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Assistant Attorney General Ginsburg, Deputy Solicitor General Cohen, Harriet S. Shapiro, Catherine G. O'Sullivan,* and *Andrea Limmer.*

*Christopher Keith Hall,* Assistant Attorney General of New York, argued the cause for appellees. With him on the brief were *Robert Abrams,* Attorney General, *O. Peter Sherwood,* Solicitor General, and *Richard G. Liskov, Lloyd Constantine,* and *August L. Fietkau,* Assistant Attorneys General.*

JUSTICE POWELL delivered the opinion of the Court.

The State of New York requires retailers to charge at least 112 percent of the "posted" wholesale price for liquor, but permits wholesalers to sell to retailers at less than the "posted" price. The question presented is whether this pricing system is valid under either the state-action exemption from the antitrust laws or the Twenty-first Amendment.

## I

### A

Wholesalers of liquor in the State of New York must file, or "post," monthly price schedules with the State Liquor Authority (SLA). N. Y. Alco. Bev. Cont. Law (ABC Law)

---

*Briefs of *amici curiae* urging affirmance were filed for Peerless Importers, Inc., et al. by *Lawrence Kill, Steven M. Pesner, Anthony A. Dean, Ralph S. Spritzer, Michael Whiteman,* and *Jonathan P. Nye;* and for Wine, Liquor & Distillery Workers Union Local 1, AFL–CIO, et al. by *Victor Feingold.*

*Martin P. Mehler* filed a brief for Metropolitan Package Store Association, Inc., et al. as *amici curiae.*

§ 101–b (McKinney 1970 and Supp. 1986).[1] The schedules must report, "with respect to each item," "the bottle and case price to retailers." § 101–b(3)(b). The ABC Law itself does not require that the posted case price of an item bear any relation to its posted bottle price. The SLA, however, has promulgated a rule stating that for cases containing 48 or fewer bottles, the posted bottle price multiplied by the number of bottles in a case must exceed the posted case price by a "breakage" surcharge of $1.92. SLA Rule 16.4(e), 9 NYCRR § 65.4(e) (1980).[2]

Retailers of liquor may not sell below "cost." ABC Law, § 101–bb(2).[3] The statute defines "cost" as "the price of such

---

[1] Section 101–b(3)(b) provides, in part:

"No brand of liquor or wine shall be sold to or purchased by a retailer unless a schedule, as provided by this section, is filed with the liquor authority, and is then in effect. Such schedule shall be in writing duly verified, and filed in the number of copies and form as required by the authority, and shall contain, with respect to each item, the exact brand or trade name, capacity of package, nature of contents, age and proof where stated on the label, the number of bottles contained in each case, the bottle and case price to retailers, the net bottle and case price paid by the seller, which prices, in each instance, shall be individual for each item and not in 'combination' with any other item, the discounts for quantity, if any, and the discounts for time of payment, if any. Such brand of liquor or wine shall not be sold to retailers except at the price and discounts then in effect unless prior written permission of the authority is granted for good cause shown and for reasons not inconsistent with the purpose of this chapter. Such schedule shall be filed by each manufacturer selling such brand to retailers and by each wholesaler selling such brand to retailers."

[2] Rule 16.4(e), 9 NYCRR § 65.4(e) (1980), provides:

"For each item of liquor listed in the schedule of liquor prices to retailers there shall be posted a bottle and a case price. The bottle price multiplied by number of containers in the case must exceed the case price by approximately $1.92 for any case of 48 or fewer containers. The figure is to be reached by adding $1.92 to the case price, dividing by the number of containers in the case, and rounding to the nearest cent. Where more than 48 containers are packed in a case, bottle price shall be computed by dividing the case price by the number of containers in the case, rounding to the nearest cent, and adding one cent. Variations will not be permitted without approval of the authority."

[3] Section 101–bb(2) provides, in part:

item of liquor to the retailer plus twelve percentum of such price." § 101–bb(2)(b). "Price," in turn, is defined as the posted bottle price in effect at the time the retailer sells or offers to sell the item. *Ibid.* Although the statute defines retail cost in terms of the wholesaler's posted bottle price, retailers generally purchase liquor by the case. The SLA expressly has authorized wholesalers to reduce, or "post off," the case price of an item without reducing the posted bottle price of the item. SLA Bulletin 471 (June 29, 1973).[4] By reducing the case price without reducing the bottle price,

---

"No licensee authorized to sell liquor at retail for off-premises consumption shall sell, offer to sell, solicit an order for or advertise any item of liquor at a price which is less than cost. As used in this section, the term:

. . . . .

"(b) 'cost' shall mean the price of such item of liquor to the retailer plus twelve percentum of such price, which is declared as a matter of legislative determination to represent the average minimum overhead necessarily incurred in connection with the sale by the retailer of such item of liquor. As used in this paragraph (b) the term "price" shall mean the bottle price to retailers, before any discounts, contained in the applicable schedule filed with the liquor authority pursuant to section one hundred one–b of this chapter by a manufacturer or wholesaler from whom the retailer purchases liquor and which is in effect at the time the retailer sells or offers to sell such item of liquor; except, that where no applicable schedule is in effect the bottle price of the item of liquor shall be computed as the appropriate fraction of the case price of such item, before any discounts, most recently invoiced to the retailer."

[4] Bulletin 471 provides, in part:

"Case prices may be posted off for any given month, or months, without an accompanying reduction in bottle prices. The wholesaler is given these choices during the period of a post-off:

"1. May elect not to reduce the bottle price, in which case the legal bottle price will be the base for the 12% retail mark-up.

"2. May reduce the bottle price to conform with the post-off case price, consistent with Rule 16.4(e), in which case the reduced bottle price will be the base for the 12% mark-up.

"3. May adopt a bottle price any where between the extremes authorized under '1' and '2' above, in which case the reduced bottle price will be the base for the 12% mark-up.

. . . . .

wholesalers can compel retailers to charge more than 112 percent of the actual wholesale cost. Similarly, because § 101–bb(2)(b) defines "cost." in terms of the posted bottle price in effect when the retailer sells or offers to sell the item, wholesalers can sell retailers large quantities in a month when prices are low and then require the retailers to sell at an abnormally high markup by raising the bottle price in succeeding months. The New York retail pricing system thus permits wholesalers to set retail prices, and retail markups, without regard to actual retail costs. New York wholesalers advertise in trade publications that their "post offs" will guarantee retailers large markups, sometimes in excess of 30 percent. App. 32–35. Wholesalers also advertise that buying large quantities while wholesale prices are low will result in extra retail profits after wholesale prices are raised. App. to Juris. Statement 101A. The effect of this complex of statutory provisions and regulations is to permit wholesalers to maintain retail prices at artificially high levels.

## B

Appellant 324 Liquor Corporation sold two bottles of liquor to SLA investigators in June 1981 for less than 112 percent of the posted bottle price. Because the wholesalers had "posted off" their June 1981 case prices without reducing the posted bottle prices, appellant's retail prices represented an 18 percent markup over its actual wholesale cost. As a result of this violation, appellant's license was suspended for 10 days and it forfeited a $1,000 bond. Appellant sought relief from the penalties on the ground that § 101–bb violates § 1 of the Sherman Act, 15 U. S. C. § 1. A New York Supreme Court denied the petition. *324 Liquor Corp.* v. *McLaughlin*, 119 Misc. 2d 746, 464 N. Y. S. 2d 355 (1983). The Appellate Division reversed. *324 Liquor Corp.* v. *McLaughlin*, 102

"Wholesalers of liquor will note that pursuant to these changes no control is placed on the number of consecutive months during which post-offs may be scheduled."

App. Div. 2d 607, 478 N. Y. S. 2d 615 (1984). The New York Court of Appeals upheld the validity of § 101–bb and reinstated the penalties. *J. A. J. Liquor Store, Inc.* v. *New York State Liquor Authority*, 64 N. Y. 2d 504, 479 N. E. 2d 779 (1985). The Court of Appeals held that § 101–bb is not immune under the state-action doctrine of *Parker* v. *Brown*, 317 U. S. 341 (1943), because the State does not actively supervise the resale price maintenance system. The court nevertheless concluded that the statute is a proper exercise of powers reserved to the State by the Twenty-first Amendment, because "the State interest in protecting retailers which underlies [the statute] is of sufficient magnitude to override the Federal policy expressed in the antitrust laws." *J. A. J. Liquor Store, Inc.* v. *New York State Liquor Authority, supra,* at 522, 479 N. E. 2d, at 789. We noted probable jurisdiction, 475 U. S. 1080 (1986), and we now reverse.

## II

In *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.,* 445 U. S. 97 (1980), we invalidated a California statute requiring all producers, wholesalers, and rectifiers of wine to file fair trade contracts or price schedules with the State. *Midcal* establishes the framework for our analysis of New York's liquor pricing system.

### A

The "threshold question," in this case as in *Midcal,* is whether the State's pricing system is inconsistent with the antitrust laws. *Id.,* at 102. Section 101–bb imposes a regime of resale price maintenance on all New York liquor retailers. Resale price maintenance has been a *per se* violation of § 1 of the Sherman Act "since the early years of national antitrust enforcement." *Monsanto Co.* v. *Spray-Rite Service Corp.,* 465 U. S. 752, 761 (1984). See *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.,* 220 U. S. 373, 404–409 (1911). Our recent decisions recognize the possibility that a vertical restraint imposed by a *single* manufacturer or whole-

saler may stimulate interbrand competition even as it reduces intrabrand competition. *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 51–52 (1977). Accordingly, we have held that concerted nonprice restrictions imposed by a single manufacturer are to be judged under the rule of reason. *Id.*, at 59. We also have held that a single manufacturer may announce resale prices in advance and refuse to deal with those who fail to comply. *Monsanto Co.* v. *Spray-Rite Service Corp.*, *supra*, at 761; *United States* v. *Colgate & Co.*, 250 U. S. 300, 307 (1919). Neither of these qualifications to the *per se* rule applies in this case. Section 101–bb directly restricts retail prices, and retailers are subject to penalties for failure to adhere to the resale price schedules. The New York statute, moreover, applies to *all* wholesalers and retailers of liquor. We have noted that industrywide resale price maintenance also may facilitate cartelization. *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, *supra*, at 51, n. 18. Mandatory industrywide resale price fixing is virtually certain to reduce interbrand competition as well as intrabrand competition, because it prevents manufacturers and wholesalers from allowing or requiring retail price competition. The New York statute specifically forbids retailers from reducing the minimum prices set by wholesalers.

The antitrust violation in this case is essentially similar to the violation in *Midcal.* It is true that the wholesalers in *Midcal* were required to adhere to a single fair trade contract or price schedule for each geographical area. 445 U. S., at 99–100. *Midcal* therefore involved horizontal as well as vertical price fixing. Although the horizontal restraint in *Midcal* may have provided an additional reason for invalidating the statute, our decision in *Midcal* rested on the "vertical control" of wine producers, who held "the power to prevent price competition by dictating the prices charged by wholesalers." *Id.*, at 103. As we explained in *Rice* v. *Norman Williams Co.*, 458 U. S. 654 (1982), the California statute

was invalidated because "it *mandated* resale price maintenance, an activity that has long been regarded as a *per se* violation of the Sherman Act." *Id.*, at 659–660 (emphasis in original; footnote omitted). We hold that ABC Law § 101–bb is inconsistent with § 1 of the Sherman Act.[5]

## B

In *Parker* v. *Brown*, 317 U. S. 341 (1943), the Court held that the Sherman Act does not apply "to the anticompetitive conduct of a State acting through its legislature." *Hallie* v. *Eau Claire*, 471 U. S. 34, 38 (1985). *Parker* v. *Brown* rests on principles of federalism and state sovereignty. Under those principles, "an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Parker* v. *Brown*, 317 U. S., at 351. At the same time, "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *Ibid.* Our decisions have established a two-part test for determining immunity under *Parker* v. *Brown*. "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc., supra*, at 105 (quoting *Lafayette* v. *Louisiana Power & Light Co.*,

---

[5] The Court of Appeals suggested that the liquor-pricing system prevents "temporary price reductions . . . threatening to drive small retailers out of business and consolidating control of the market in the hands of a relatively few mass distributors who could then dictate prices to the ultimate injury of consumers . . . ." *J. A. J. Liquor Store, Inc.* v. *New York State Liquor Authority*, 64 N. Y. 2d 504, 520, 479 N. E. 2d 779, 788 (1985). In *Matsushita Electric Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574 (1986), we recognized that predatory pricing schemes are "rarely tried, and even more rarely successful." *Id.*, at 589. In this case, the possibility of success is practically nonexistent, because liquor retailers are limited to a single outlet. ABC Law § 63.5 (McKinney 1970). In any event, § 101–bb forbids not only predatory pricing, but all price competition among retailers.

435 U. S. 389, 410 (1978) (plurality opinion)). New York's liquor-pricing system meets the first requirement. The state legislature clearly has adopted a policy of resale price maintenance. Just as clearly, however, New York's liquor-pricing system is not actively supervised by the State. As in *Midcal*, the State "simply authorizes price setting and enforces the prices established by private parties."[6] 445

---

[6] A simple "minimum markup" statute requiring retailers to charge 112 percent of their actual wholesale cost may satisfy the "active supervision" requirement, and so be exempt from the antitrust laws under *Parker* v. *Brown*, 317 U. S. 341 (1943). See *Morgan* v. *Division of Liquor Control, Conn. Dept. of Business Regulation*, 664 F. 2d 353 (CA2 1981) (upholding a simple markup statute). Section 101–bb, however, is not a simple minimum markup statute because it imposes a markup on the "posted bottle price," a price that may greatly exceed what the retailer actually paid for the liquor. As we have explained, *supra,* at 339–340, Bulletin 471 permits wholesalers to reduce the case price—the price actually paid by most retailers—without reducing the bottle price. The New York Court of Appeals expressly held that Bulletin 471 "is consistent with Alcoholic Beverage Control Law § 101–b(3) which does not mandate any price ratio between scheduled case and bottle prices." *J. A. J. Liquor Store, Inc.* v. *New York State Liquor Authority, supra,* at 523, 479 N. E. 2d, at 790. We may not "construe a state statute contrary to the construction given it by the highest court of a State." *O'Brien* v. *Skinner*, 414 U. S. 524, 531 (1974). Appellees nevertheless argue that invalidation of Bulletin 471 does not require invalidation of § 101–bb. Appellees contend that § 101–bb does not prevent the SLA from establishing a relationship between case price and bottle price; indeed, Rule 16.4(e) establishes such a relationship. Brief for Appellees 24–25, n. 37. Invalidation of Bulletin 471 alone, however, would not prevent wholesalers from selling large quantities at low prices in one month, and then requiring retailers to charge abnormally high markups by raising bottle prices in subsequent months. See *supra,* at 340. We cannot accept appellees' suggestion that such unsupervised price fixing should be tolerated as a reasonable accounting method or as a hedge against inflation. See App. to Juris. Statement 101A (advertising a guaranteed 31.3 percent markup on liquor purchased in August 1984 and sold in September 1984). We thus have no occasion to consider whether a simple minimum markup statute would be entitled to antitrust immunity under *Parker* v. *Brown*.

Some States completely control the distribution of liquor within their boundaries. *E. g.,* Va. Code §§ 4–15, 4–28 (1983). Such comprehensive

U. S., at 105. New York "neither establishes prices nor reviews the reasonableness of the price schedules." *Ibid.* New York "does not monitor market conditions or engage in any 'pointed reexamination' of the program." *Id.*, at 106 (quoting *Bates* v. *State Bar of Arizona*, 433 U. S. 350, 362 (1977)).[7] Each wholesaler sets its own "posted" prices; the State does not control month-to-month variations in posted prices. Nor does the State supervise the wholesaler's decision to "post off," the amount of the "post off," the corresponding decrease, if any, in the bottle price, or the frequency with which a wholesaler posts off. The State has displaced competition among liquor retailers without substituting an adequate system of regulation. "The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." 445 U. S., at 106.[8]

---

regulation is immune under *Parker* v. *Brown* because the State substitutes its own power for "unfettered business freedom." See *New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.*, 439 U. S. 96, 109 (1978).

[7] In a concurring opinion, Judge Jasen argued that the State actively supervises the liquor-pricing system. *J. A. J. Liquor Store, Inc.* v. *New York State Liquor Authority, supra*, at 526–529, 479 N. E. 2d, at 792–794. Judge Jasen noted that the SLA can respond to market conditions by permitting individual wholesalers to depart from their posted prices, ABC Law § 101–b(3)(b), and by permitting individual retailers to sell below the statutory definition of "cost," § 101–bb(3), "for good cause shown." Bulletin 471 itself was issued by the SLA in response to market conditions. Moreover, the state legislature frequently considers proposals to alter the liquor-pricing system. Neither the "monitoring" by the SLA, nor the periodic reexaminations by the state legislature, exerts any significant control over retail liquor prices or markups. Thus, the State's involvement does not satisfy the second requirement of *Midcal.*

[8] The same considerations lead us to reject appellees' contention that there is no "contract, combination . . . , or conspiracy, in restraint of trade." 15 U. S. C. § 1. Where "private actors are . . . granted 'a degree of private regulatory power' . . . the regulatory scheme may be attacked under § 1" as a "hybrid" restraint. *Fisher* v. *Berkeley*, 475 U. S. 260, 268 (1986) (quoting *Rice* v. *Norman Williams Co.*, 458 U. S. 654, 666, n. 1

## III

Section 2 of the Twenty-first Amendment reserves to the States the power to regulate, or prohibit entirely, the transportation or importation of intoxicating liquor within their borders.[9] Section 2 "grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system." *Midcal*, 445 U. S., at 110. The States' Twenty-first Amendment powers, though broad, are circumscribed by other provisions of the Constitution. · See *Larkin* v. *Grendel's Den, Inc.*, 459 U. S. 116, 122, n. 5 (1982) (Establishment Clause); *Craig* v. *Boren*, 429 U. S. 190, 204–209 (1976) (Equal Protection Clause); *Wisconsin* v. *Constantineau*, 400 U. S. 433, 436 (1971) (procedural due process); *Department of Revenue* v. *James Beam Co.*, 377 U. S. 341, 345–346 (1964) (Export-Import Clause). Although § 2 directly qualifies the federal commerce power, the Court has rejected the view "that the Twenty-first Amendment has somehow operated to 'repeal' the Commerce Clause wherever regulation of intoxicating liquors is concerned." *Hostetter* v. *Idlewild Liquor Corp.*, 377 U. S. 324, 331–332 (1964).[10] Instead, the Court has en-

---

(1982) (STEVENS, J., concurring in judgment)). See *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S. 384 (1951). Our decisions reflect the principle that the federal antitrust laws pre-empt state laws authorizing or compelling private parties to engage in anticompetitive behavior. See also *Northern Securities Co.* v. *United States*, 193 U. S. 197, 345–346 (1904) (plurality opinion); 1 P. Areeda & D. Turner, Antitrust Law ¶ 209, pp. 60–62 (1978). That principle squarely governs this case.

[9] Section 2 of the Twenty-first Amendment provides: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

[10] The dissenting opinion concedes that "neither the House of Representatives nor the state ratifying conventions deliberated long on the powers conferred on the States by § 2." *Post*, at 353. It nevertheless maintains that the Senate debates "clearly demonstrate an intent to confer on States complete and exclusive control over the commerce of liquor." *Post*, at 354. We find no such clear demonstration of congressional intent. It is

gaged in a "pragmatic effort to harmonize state and federal powers." *Midcal, supra,* at 109. The question in each case is "whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express federal policies." *Capital Cities Cable, Inc.* v. *Crisp,* 467 U. S. 691, 714 (1984).

---

true that Senator Blaine, the Senate sponsor of the Amendment, at one point stated that the purpose of § 2 was "to restore to the States . . . absolute control in effect over interstate commerce affecting intoxicating liquors . . . ." 76 Cong. Rec. 4143 (1933). At another point, however, Senator Blaine appeared to advance a narrower interpretation: "So, to assure the so-called dry States against the importation of intoxicating liquor into those States, it is proposed to write permanently into the Constitution a prohibition along that line." *Id.,* at 4141.

The dissent also maintains that the behavior of the States following ratification supports the view that States have power to enact laws governing the pricing of liquor free of the strictures of federal antitrust policy. One commentator is quoted as saying that the States adopted "'bold and drastic experiments'" in price control. *Post,* at 357, quoting De Ganahl, Trade Practice and Price Control in the Alcoholic Beverage Industry, 7 Law & Contemp. Prob. 665, 680 (1940). In the next paragraph, however, this writer states that "[b]ecause the experiments came at a time when neither the fair-trade law nor the constitutional law on liquor was settled . . . there is uncertainty as to the validity of much of this legislation." *Ibid.* When the Twenty-first Amendment was adopted, it was far from clear that the federal commerce power extended to intrastate retail sales of liquor. See *A. L. A. Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, 542–548 (1935) (holding that the commerce power does not extend to intrastate sales of poultry, even when the poultry has been shipped across state lines). The Miller-Tydings Fair Trade Act of 1937, 50 Stat. 693, moreover, permitted States to authorize agreements prescribing prices for the resale of specified commodities, including liquor. Even after the passage of the Miller-Tydings Act, price control laws were not as universally popular as the dissent implies. In 1940, for example, only 18 of the 45 "wet" States had price stabilization provisions written into their alcoholic beverage statutes, De Ganahl, *supra,* at 680, while in 17 States the State itself monopolized sales of liquor, Shipman, State Administrative Machinery for Liquor Control, 7 Law & Contemp. Prob. 600, 601, n. 5 (1940).

A

The New York Court of Appeals concluded that § 101–bb "was expressly designed to preserve competition in New York's retail liquor industry by stabilizing the retail market and protecting the economic position of small liquor retailers." *J. A. J. Liquor Store, Inc.* v. *New York State Liquor Authority*, 64 N. Y. 2d, at 520, 479 N. E. 2d, at 788. The Court of Appeals traced the recent history of the State's regulation of retail liquor prices. In early 1964, the Moreland Commission completed an extensive study of the state laws governing the sale and distribution of alcoholic beverages. New York State Moreland Comm'n on the Alcoholic Beverage Control Law, Report and Recommendations Nos. 1–3 (1964). "The Commission's major findings were that New York consumers suffered from serious price discrimination when compared to liquor consumers in other States and that a severe lack of competition existed in the New York retail market." *J. A. J. Liquor Store, Inc.* v. *New York State Liquor Authority*, *supra*, at 519, 479 N. E. 2d, at 787. The New York Legislature responded in 1964 by enacting sweeping changes in the ABC Law primarily intended to promote price competition among liquor retailers. *Ibid.* The 1964 version of § 101–bb prohibited retail sales below cost and defined cost as the bottle price in effect when the retailer sells or offers to sell the item. ABC Law § 101–bb (McKinney 1970). During the years between 1964 and 1971, the number of liquor stores in New York declined. The State Senate Excise Committee investigated the decline and concluded that "the mass of small retailers are unable to compete with the large volume outlets that have emerged." New York State Legislature, Senate Excise Committee, Final Report 29–30 (Mar. 5, 1971). In 1971 the legislature enacted the current version of ABC Law § 101–bb to "protec[t] the economic position of small liquor retailers." *J. A. J. Liquor Store, Inc.* v. *New York State Liquor Authority*, *supra*, at 520, 479 N. E. 2d, at 788.

We agree with the New York Court of Appeals that the purpose of the 12-percent minimum markup is to protect small retailers. We have noted that the 12-percent markup is imposed on the "posted bottle price," a price that may differ from the actual wholesale price paid by the retailer. See *supra*, at 339–340. There is no indication in the statute or its legislative history, however, that the purpose of defining cost as "posted bottle price" was to protect small retailers. The New York Legislature first defined cost in terms of posted bottle price in the 1964 amendments to the ABC Law. The purpose of those amendments, as the New York Court of Appeals found, was to increase price competition among liquor retailers. The 1971 amendments simply retained bottle price as the basis of the statutory definition of cost and added 12 percent to reflect the retailer's overhead and operating expenses. Indeed, the legislative Committee that considered the 1971 amendments concluded that the bottle price definition of cost put small retailers at a slight disadvantage. The Committee noted that "[t]he present definition of 'cost' [as] scheduled bottle cost to the retailer does afford some margin of profit to large retailers in particular, and, to a lesser extent, to all retailers who can afford to buy by the case." New York State Senate Excise Committee, Final Report, *supra*, at 8–9. The Committee suggested that "consideration be accorded to . . . [r]evision or elimination of . . . 'post offs' practices that appear to afford discriminatory advantages to possession of great purchasing power." *Id.*, at 41. The Committee did not recommend an amendment to this effect because it considered the matter "outside the scope of the directive given to this Committee." *Ibid.*[11]

---

[11] There is no indication that the purpose of Bulletin 471 is to protect small retailers. The Bulletin states that its purpose is to prevent "a situation during post-off periods which resulted in what became known as a 'two bottle' price." App. to Juris. Statement 71A. Although there is no precise explanation of "two bottle pricing" in the record, the caption of Bulletin 471 is "Unlawful Discrimination and Price Scheduling—Bottle Price

In *Midcal*, we found nothing in the record to suggest that California's wine-pricing system actually helped sustain small retailers. 445 U. S., at 113. Similarly, in this case the New York Court of Appeals cited no legislative or other findings that either the minimum markup requirement or the "bottle price" definition of cost has been effective in preserving small retail establishments, and made no findings of its own. Our *Midcal* opinion cites evidence that States with "fair trade laws" not unlike ABC Law § 101–bb actually had higher rates of firm failure, and slower rates of growth of small retail stores, than free trade States in the years between 1956 and 1972. 445 U. S., at 113 (citing S. Rep. No. 94–466, p. 3 (1975)). The only relevant evidence in the record indicates that the number of retail liquor outlets in New York continued to decline between 1970 and 1979. App. to Juris Statement 99A. We are unwilling to assume on the basis of this record that § 101–bb has the effect of protecting small retailers.

In this case, as in *Midcal,* the State's unsubstantiated interest in protecting small retailers "simply [is] not of the same stature as the goals of the Sherman Act." 445 U. S., at 114. New York's resale price maintenance system directly conflicts with the "familiar and substantial" federal interest in enforcement of the antitrust laws. *Id.,* at 110. "Antitrust laws in general, and the Sherman Act in particular . . . are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States* v. *Topco Associates, Inc.,* 405 U. S. 596, 610 (1972). We therefore conclude that the State's asserted interest in

---

During Post-Down." *Ibid.* This suggests that the SLA was concerned with ensuring that wholesalers charge the same price to all retailers, and not with the relationship between the retailer's actual cost and the required markup.

protecting small retailers does not suffice to afford immunity from the Sherman Act.[12]

## B

Appellees finally argue that § 101–bb furthers the State's interest in promoting temperance. Brief for Appellees 39–44. One would hardly suggest that the New York Legislature set out to promote temperance by increasing the number of retail outlets for liquor. Rather, appellees argue that New York's pricing system has the effect of raising retail prices, and that higher prices decrease consumption of liquor. The New York Court of Appeals did not find that the statute was intended to promote temperance, or that it does so. On the contrary, that court cited the conclusion of the Moreland Commission that higher prices do not decrease consumption of liquor. *J. A. J. Liquor Store, Inc.* v. *New York State Liquor Authority*, 64 N. Y. 2d, at 521, n. 2, 479 N. E. 2d, at 788, n. 2 (citing Moreland Comm'n Report No. 1, at 3, 17). Of course, we are not bound by findings of the Court of Appeals that undercut powers reserved by the Twenty-first Amendment. *Midcal, supra,* at 111; *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652, 659 (1945). We nevertheless accord "great weight to the views of the State's highest court" on state-law matters, *Indiana ex rel. Anderson* v. *Brand,* 303 U. S. 95, 100 (1938), and customarily accept the factual findings of state courts in the absence of exceptional circumstances. *Midcal, supra,* at 111–112. Our review of the record discloses no such exceptional circumstances in this case.[13] We therefore do not reach the question whether New

---

[12] We have no occasion in this case to consider whether the State's interest in protecting small retailers ever could prevail against the federal interest in enforcement of the antitrust laws.

[13] It is far from certain that the New York Legislature intended to promote temperance, or that the retail price maintenance system actually decreases consumption. Section 101–bb, like other sections of the ABC Law, recites that it is enacted "for the purpose of fostering and promoting temperance." ABC Law § 101–bb(1) (McKinney 1970). This statement is not supported by specific findings, or by evidence in the record. In

York's liquor-pricing system could be upheld as an exercise of the State's power to promote temperance.

## IV

We conclude that the Twenty-first Amendment provides no immunity for New York's authorization of private, unsupervised price fixing by liquor wholesalers. We therefore reverse the judgment of the New York Court of Appeals and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE joins, dissenting.

Immediately after the ratification of the Twenty-first Amendment, this Court recognized that the broad language of § 2 of the Amendment conferred plenary power on the States to regulate the liquor trade within their boundaries. *Ziffrin, Inc.* v. *Reeves,* 308 U. S. 132 (1939); *Finch & Co.* v. *McKittrick,* 305 U. S. 395 (1939); *Indianapolis Brewing Co.* v. *Liquor Control Comm'n,* 305 U. S. 391 (1939); *State Board of Equalization* v. *Young's Market Co.,* 299 U. S. 59 (1936). As JUSTICE STEVENS recently observed, however, the Court has, over the years, so "completely distorted the Twenty-

*Midcal,* we accepted the California Supreme Court's rejection of a similar declaration of legislative purpose. 445 U. S., at 112–114 (discussing *Rice* v. *Alcoholic Beverage Control Appeals Bd.,* 21 Cal. 3d 431, 457–459, 579 P. 2d 476, 493–494 (1978)). The legislative Report accompanying § 101–bb does not suggest that the amendment was aimed at decreasing consumption. Rather, the Report focuses on the need to protect small retailers. New York State Legislature, Senate Excise Committee, Final Report 30, 37 (Mar. 1971). The Report does express concern over the increase in liquor consumption during the years between 1964 and 1971. *Id.,* at 16. But the Report recognizes the Moreland Commission's finding that higher prices do not reduce consumption, and states that "because of the multiplicity of factors involved and lack of data on specifics, the Committee is unable to determine what portion of such increase is attributable to any particular factors." *Id.,* at 14.

first Amendment" that "[i]t now has a barely discernible effect in Commerce Clause cases." *Newport* v. *Iacobucci, ante,* at 98 (dissenting). Because I believe that the Twenty-first Amendment clearly authorized the State of New York to regulate the liquor trade within its borders free of federal interference, I dissent from Part III of the Court's opinion, and would affirm the judgment of the New York Court of Appeals.

I

In *Hostetter* v. *Idlewild Liquor Corp.,* 377 U. S. 324 (1964), this Court took a first step toward eviscerating the authority of States to regulate the commerce of liquor. The Court held that the State of New York could not regulate the importation of liquor into that State when the liquor was sold in duty-free shops at the Kennedy Airport. The basis for this decision was the fact that the United States Customs Service already supervised the liquor sold at the airport. Justice Black, who as a Senator was present at the creation of the Twenty-first Amendment, wrote a thoughtful and powerful dissent. After reviewing the legislative history of the Twenty-first Amendment, Justice Black concluded that the Senators who approved the Twenty-first Amendment thought they were returning absolute control over the liquor industry to the States, and "were seeing to it that the Federal Government could not interfere with or restrict the State's exercise of the power conferred by the Amendment." *Id.,* at 338 (dissenting). Because the Court has seen fit in recent years to dismiss this legislative history without analysis as "obscure," *Bacchus Imports, Ltd.* v. *Dias,* 468 U. S. 263, 274 (1984); *ante,* at 346–347, n. 10, a fresh examination of the origins of the Twenty-first Amendment is in order and long overdue.

Although neither the House of Representatives nor the state ratifying conventions deliberated long on the powers conferred on the States by § 2, but see 76 Cong. Rec. 2776 (1933) (statement of Rep. Lea of California that the section was "the

extreme of State rights" because it obligated the Federal Government to assist the enforcement of state laws "however unwise or improvident"), the Senate considered the section in great detail. Those Senate discussions clearly demonstrate an intent to confer on States complete and exclusive control over the commerce of liquor.

When the Senate began its deliberations on the Twenty-first Amendment, the proposed Amendment included a § 3 not present in the adopted Amendment. This section granted the Federal Government concurrent authority over some limited aspects of the commerce of liquor. It provided that "Congress shall have concurrent power to regulate or prohibit the sale of intoxicating liquors to be drunk on the premises where sold." *Id.*, at 4138. As Justice Black observed, the proposal "to leave even this remnant of federal control over liquor traffic gave rise to the only real controversy over the language of the proposed Amendment." 377 U. S., at 337. Even Senator Blaine, the Chairman of the Senate Subcommittee that had held hearings on the proposed Amendment, opposed the limited grant of authority to the Federal Government in § 3. According to Senator Blaine, when the Federal Government was organized by the Constitution the States had "surrendered control over and regulation of interstate commerce." 76 Cong. Rec. 4141 (1933). He viewed § 2 of the Amendment as a restoration of the power surrendered by the States when they joined the Union. Section 2 "restor[ed] to the States, in effect, the right to regulate commerce respecting a single commodity — namely, intoxicating liquor." *Ibid.* In his view, the grant of authority to Congress in § 3 undercut the import of § 2:

> "Mr. President, my own personal viewpoint upon section 3 is that it is contrary to section 2 of the resolution. I am now endeavoring to give my personal views. The purpose of section 2 is to restore to the States by constitutional amendment absolute control in effect over interstate commerce affecting intoxicating liquors which

enter the confines of the States. The State under section 2 may enact certain laws on intoxicating liquors, and section 2 at once gives such laws effect. Thus the States are granted larger power in effect and are given greater protection, while under section 3 the proposal is to take away from the States the powers that the States would have in the absence of the eighteenth amendment." *Id.*, at 4143.

Senator Wagner was an especially vigorous opponent of the proposed § 3. In his view, it failed to "correct the central error of national prohibition. It does not restore to the States responsibility for their local liquor problems. It does not withdraw the Federal Government from the field of local police regulation into which it has trespassed." *Id.*, at 4144. In Senator Wagner's view, the danger of § 3 was that even this limited grant of authority to the Federal Government would result in federal control of the liquor trade:

> "If Congress may regulate the sale of intoxicating liquors where they are to be drunk on premises where sold, then we shall probably see Congress attempt to declare during what hours such premises may be open, where they shall be located, how they shall be operated, the sex and age of the purchasers, the price at which the beverages are to be sold. . . .
>
>      .          .          .          .          .
>
> "It is entirely conceivable that in order to protect such a prohibition the courts might sustain the prohibition or regulation of all sales of beverages whether intended to be drunk on the premises or not. And if sales may be regulated, so may transportation and manufacture. . . . If that is to be the history of the proposed amendment—and there is every reason to expect it—then obviously we have expelled the system of national control through the front door of section 1 and readmitted it forthwith through the back door of section 3." *Id.*, at 4147.

Other Senators also expressed the fear that "any grant of power to the Federal Government, even a seemingly narrow one, could be used to whittle away the exclusive control over liquor traffic given the States by Section 2." *Hostetter*, 377 U. S., at 337 (Black, J., dissenting); see 76 Cong. Rec. 4143 (1933) (Sen. Blaine); *id.*, at 4177–4178 (Sen. Black). Still others emphasized the plenary power granted the States by § 2. Senator Walsh, a member of the Subcommittee that had held hearings on the Amendment, said: "The purpose of the provision in the resolution reported by the committee was to make the intoxicating liquor subject to the laws of the State once it passed the State line and before it gets into the hands of the consignee as well as thereafter." *Id.*, at 4219. In response to a question from Senator Swanson, Senator Robinson of Arkansas affirmed that "it is left entirely to the States to determine in what manner intoxicating liquors shall be sold or used and to what places such liquors may be transported." *Id.*, at 4225. Thus, upon the motion of Senator Robinson, the Senate voted to strike § 3 from the proposed Amendment. *Id.*, at 4179.

By emphasizing the importance of the plenary powers granted the States in § 2, and more importantly by removing even the limited grant of authority to Congress contained in § 3, the Senate made manifest its intent to prevent any federal interference with state attempts to regulate the liquor trade. It is difficult to believe that the Senators would have anticipated that a federal statute enacted under the commerce power could ever override the State's power to regulate the liquor trade.

## II

The history of the Amendment strongly supports Justice Black's view that the Twenty-first Amendment was intended to return absolute control of the liquor trade to the States, and that the Federal Government could not use its Commerce Clause powers to interfere in any manner with the States' exercise of the power conferred by the Amendment.

Given its desire to confer broad freedom on the States to regulate commerce in intoxicating liquors without federal interference, Congress certainly intended that the States have the power to enact economic regulations governing the pricing of liquor free of federal antitrust policy.

The behavior of the States upon the ratification of the Twenty-first Amendment also supports this view. Contemporaneously with the enactment of the Twenty-first Amendment, a report sponsored by John D. Rockefeller, Jr., recommended that those States that could not muster the political support for state monopolies in the liquor industry should adopt the equivalent solution of price-control laws designed to keep the price of liquor at high levels. R. Fosdick & A. Scott, Toward Liquor Control 52 (1933). According to this report, the "profit motive is the core of the problem." *Id.*, at 61. This profit motive encouraged low prices that stimulated liquor consumption. *Id.*, at 149. Retail prices had a "direct bearing on the amount of consumption," *id.*, at 81, and thus a State could use price-fixing powers "as one of its most effective instruments of control." *Id.*, at 82. The ideas expressed by the Rockefeller Report "were the dominant ideas which took flesh in the post-repeal legislation of the states." Dunsford, State Monopoly and Price-Fixing in Retail Liquor Distribution, 1962 Wis. L. Rev. 454, 464. It is not surprising, therefore, that even before the enactment of the Miller-Tydings Fair Trade Act of 1937, 50 Stat. 693, States exercised their Twenty-first Amendment powers to adopt "bold and drastic experiments in price control," including price posting, regulation by private associations, and mandatory resale price maintenance contracts. De Ganahl, Trade Practice and Price Control in the Alcoholic Beverage Industry, 7 Law & Contemp. Prob. 665, 680 (1940). Thus, the States that ratified the Twenty-first Amendment immediately exercised the authority granted them by § 2 of that Amendment to enact the very type of statute that this Court strikes down today.

With the clear legislative intent to free state regulation of liquor from federal interference, and the immediate enactment of price-control laws by the ratifying States, the better view of the proper resolution of any apparent conflict between the Sherman Act and a state regulation of the liquor trade was expressed by Justice Frankfurter in *United States v. Frankfort Distilleries, Inc.*, 324 U. S. 293, 300–302 (1945) (concurring). In Justice Frankfurter's view, the Twenty-first Amendment accorded States the power to control the liquor traffic "according to their notions of policy freed from the restrictions upon state power which the Commerce Clause implies as to ordinary articles of commerce." *Id.*, at 300. Because Congress enacted the Sherman Act pursuant to its authority in the Commerce Clause, the Sherman Act must yield to state power drawn from the Twenty-first Amendment. *Id.*, at 301. Thus, Justice Frankfurter concluded:

> "If a State for its own sufficient reasons deems it a desirable policy to standardize the price of liquor within its borders either by a direct price-fixing statute or by permissive sanction of such price-fixing in order to discourage the temptations of cheap liquor due to cutthroat competition, the Twenty-first Amendment gives it that power and the Commerce Clause does not gainsay it. Such state policy can not offend the Sherman Law even though distillers or middlemen agree with local dealers to respect this policy." *Ibid.*

Justice Frankfurter believed that in the absence of a conflict between the state regulatory scheme and the federal antitrust laws, federal antitrust policy was fully applicable even to the intrastate liquor trade. In *Frankfort Distilleries* itself, the State had not authorized the anticompetitive conduct of the respondents. Once a State has exercised its § 2 power, however, "the Sherman Law could not override such exercise of state power." *Id.*, at 302.

Justice Frankfurter was not alone in this view. In repealing the Miller-Tydings Act—which had authorized States to enact fair trade laws—the Senate believed that the States could continue to impose retail price maintenance on liquor retailers. The Report from the Senate Judiciary Committee on the proposal to repeal the Miller-Tydings Act explicitly assured the Senate that the repeal would not change the power of States to impose retail price maintenance on liquor retailers pursuant to the authority granted the States by the Twenty-first Amendment:

> "Liquor will not be affected by the repeal of the fair trade laws in the same manner as other products because the Twenty-First Amendment to the Constitution gives the States broad powers over the sale of alcoholic beverages. Thus, while repeal of the fair trade laws generally will prohibit manufacturers from enforcing resale prices, alcohol manufacturers may do such in States which pass price fixing statutes pursuant to the Twenty-First Amendment." S. Rep. No. 94–466, p. 2 (1975).

The history and purpose of the Twenty-first Amendment are a compelling indication of an intent to confer on States the power to regulate trade in liquor. Despite this clear intent, the Court in recent years has used a balancing test to resolve conflicts between federal statutes and state laws enacted pursuant to § 2. In *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980), and once again today, the Court ventured still further from the intent of the Twenty-first Amendment by adopting an unprecedented test that focuses on the wisdom of the State's exercise of its § 2 powers. For the Court today does not invalidate the ABC Law because it involves an exercise of power outside the scope of the Twenty-first Amendment—indeed, the Court could not do so given the long history of the use of price controls by state liquor authorities. Instead, in a manner reminiscent of the long-repudiated *Lochner* v. *New York*, 198 U. S. 45 (1905), the Court strikes down the ABC Law be-

cause it concludes that the law was not "effective" in preserving small retail establishments or in decreasing alcohol consumption.   The proper inquiry, however, is not whether the State of New York chose wisely in enacting a retail price maintenance law, nor whether the State of New York's motivation in doing so was linked to a "central purpos[e]" of the Twenty-first Amendment.   The sole "question is whether the provision in this case is an exercise of a power expressly conferred upon the States by the Constitution." *Bacchus Imports, Ltd.* v. *Dias,* 468 U. S., at 287 (STEVENS, J., dissenting).

Because the State of New York was plainly exercising its § 2 power to regulate liquor trade, I respectfully dissent.