**Dilcia Ocasio BERRIOS, Plaintiff,**

v.

**BRISTOL MYERS SQUIBB, Puerto Rico, Inc., et seq., Defendants.**

**Civil No. 98–2071(JP).**

United States District Court, D. Puerto Rico.

April 26, 1999.

---

**62**

María S. Kortright Soler, San Juan, PR, for plaintiff.

James D. Noel, McConnel Valdés, San Juan, PR, for defendant.

### ORDER

PIERAS, Senior District Judge.

### I. INTRODUCTION

Before the Court are several sets of motions. The Court first considers Plain-

1. Since the District of Puerto Rico's Senior Judges are located in a different building than the Clerk's office, all original documents remain with the Clerk of the Court and the judges work with a duplicate file. Thus, in all cases assigned to Senior Judges, a copy of all motions and documents submitted *must* accompany all filings. In addition, the parties

tiffs' Opposition to Defendants' "Motion to Dismiss Claims Against Clotilde Mena" (**docket No. 19**); Co– Defendant Clotilde Mena's ("Mena") Request for Authorization to File Reply to Plaintiffs' Opposition to Motion to Dismiss Claim Against Clotilde Mena (docket No. 28); and Mena's Reply to Plaintiffs' Opposition to Motion Requesting Dismissal of Claims Against Clotilde Mena (docket No. 33). On March 2, 1999, the Court entered an Order (docket No. 22) ruling on Mena's Motion dismissing all claims against her at the time ("March 2nd Order"). Although Plaintiffs filed their response on March 1, 1999, the last day to file a response, such document was not received in chambers before entering the March 2nd Order.[1] The Court, however, shall consider Plaintiff's Response and Mena's Reply. The Court will then consider Plaintiffs' Motion Requesting Leave to Amend Complaint (**docket No. 14**), and Co–Defendant Mena's Motion to Dismiss Act 44 Claim Against Clotilde Mena (**docket No. 29**). The Court will finally consider Plaintiff's Motion Regarding Initial Scheduling Conference Order (**docket No. 24**).

### II. BACKGROUND

Plaintiffs are Dilcia Ocasio ("Ocasio"); her common law husband, Juan Vélez–Albarrán ("Vélez"); and their two children, Mónica Vélez–Ocasio ("Mónica") and Juan Vélez–Ocasio ("Juan"). Because Plaintiffs' Opposition to Defendants' Motion to Dismiss; Mena's Request for Authorization to File Reply to Plaintiffs' Opposition; and Mena's Reply to Plaintiffs' Opposition arise out of Mena's Motion to Dismiss, the Court shall read the allegations under a Fed.R.Civ.P. 12(b)(6) standard.

shall also provide a courtesy copy to the Judge's chambers. The parties are admonished that failure to comply with the terms of this order may result in the imposition of sanctions including but not limited to the imposition of sanctions against counsel personally.

## A. Standard Under Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a defendant may, in response to an initial pleading, file a motion to dismiss the complaint for failure to state a claim upon which relief can be granted. It is well-settled, however, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Miranda v. Ponce Fed. Bank*, 948 F.2d 41 (1st Cir. 1991). The Court must accept as true the well-pleaded factual averments contained in the complaint, while at the same time drawing all reasonable inferences therefrom in factor of the plaintiff. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 276, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Correa–Martínez v. Arrillaga–Beléndez*, 903 F.2d 49, 51 (1st Cir.1990). In opposing a Rule 12(b)(6) motion, "a plaintiff cannot expect a trial court to do his homework for him." *McCoy v. Massachusetts Institute of Technology*, 950 F.2d 13, 22 (1st Cir.1991). Rather, the plaintiff has an affirmative responsibility to put his best foot forward in an effort to present a legal theory that will support his claim. *Id.* at 23 (citing *Correa–Martínez*, 903 F.2d at 52; *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir. 1989); *Ryan v. Scoggin*, 245 F.2d 54, 57 (10th Cir.1957)). Plaintiff must set forth in his complaint "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable theory." *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir.1988). Therefore, for purposes of this discussion, Defendants assume that the following allegations are true.

## B. Factual Background

Ocasio began working for Defendant Bristol Myers Squibb Puerto Rico, Inc. ("Bristol") on May 1, 1988 as a Sales Representative. Since the date of her employment and for the following eight years, Ocasio performed her duties in an "effective or good" manner. Her performance was at this level up until the period immediately prior to being diagnosed with having a brain tumor in May of 1996. The symptoms of the tumor manifested themselves in April 1996 when Ocasio started suffering from a major depression. During this time, Ocasio's supervisor called her to a meeting to notify her that she was being placed on probation.

In June of 1996, Ocasio traveled outside of Puerto Rico for surgery to treat the brain tumor. Despite medical intervention, the tumor had maintained its size. By early September of 1996, Ocasio's doctors certified that her condition was stable, and, in turn, Ocasio called her supervisors to notify them that she was able to return to work. Bristol, however, responded that she had to wait until the Human Resources Department officials called her before returning to work. Bristol notified Ocasio that she could return to work, and she returned on October 1, 1996. Shortly thereafter and for no apparent legal reason, Ocasio was placed on probation by her supervisor Manuel López–Cepero ("López–Cepero").

On November 22, 1996, Ocasio requested reasonable accommodations from Bristol due to her diagnosed conditions and difficulty in driving at night on dark roads after working long days. Instead of accommodating her, Bristol sent Ocasio home, told her to apply for disability benefits, and took away all her responsibilities. On January 11, 1997, Bristol removed the car assigned to Ocasio; and on January 13, 1997, López–Cepero arrived at Ocasio's home and removed all her work materials, equipment, credit card, "pager", and the car assigned to her.

From November to May 1997, Ocasio insisted that she could perform her duties, making a request to be reinstated on March 13, 1997. After holding a meeting on March 26, 1997 with Mena, the Human

Resources Director, Bristol decided not to give her reasonable accommodations. Ocasio was offered no alternatives, and she was just told that she should apply for disability leave through Bristol's long-term disability retirement program. Bristol told Ocasio that if she refused to apply for long-term leave she would be terminated. Although Ocasio asked to be reinstated and said that she could perform her work, Bristol insisted that Ocasio fill out her disability papers.

Thereafter, Dr. Luis Serrano, a neuro-ophthalmologist, examined Ocasio and determined that she could perform her duties. Bristol did not inform Ocasio of these results for a considerable period of time and did not call Ocasio to report back to work. Despite knowing that Ocasio could work, Bristol never contacted her to discuss Dr. Serrano's results and instead mailed a letter to Ocasio firing her because she had abandoned her position. Ocasio was permanently replaced by a male employee because Bristol wanted a male sales representative handling the Southwestern region of Puerto Rico.

Since the March 2nd Order, Plaintiffs have voluntarily withdrawn their claims against Mena under the federal and local employment discrimination statutes.[2] (Mem.Supp. Pls.' Opp'n Defs' Mot. Dismiss Claims Against Clotilde Mena at 5). Ocasio, however, brings several claims against Bristol under the Title VII, the Americans with Disabilities Act ("ADA"); Puerto Rico Law 80, P.R.Laws Ann. tit. 29, §§ 185a–185k ("Law 80"); Puerto Rico Law 100, P.R.Laws Ann. tit. 29, § 146 ("Law 100"). Co–Plaintiffs Vélez, Mónica, and Juan bring claims against Defendants Bristol and Mena under the Puerto Rico general tort statute, Article 1802 of the Puerto Rico Civil Code, P.R.Laws Ann. tit. 31, § 5141. Ocasio never raised a tort claim against Mena or Bristol.

Faced with these causes of action, Co–Defendant Mena argues that Vélez, Móni-ca, and Juan's tort claims against her should be dismissed because under Puerto Rico law, tort claims of the relative of a victim of employment discrimination are contingent on the victim's causes of action for employment discrimination. Therefore, if Ocasio cannot sustain a claim against Mena under the employment discrimination statutes, her relatives cannot maintain a cause of action in tort against her. Mena further argues that Plaintiffs' Amended Complaint, which adds a claim under the Puerto Rico anti-discrimination law, Law 44, should be dismissed because she is not subject to liability under the statute.

## III. DISCUSSION

### A. Claims Against Mena

#### 1. Relatives' Claims in Tort Against Mena

The Court is asked to determine whether a common law husband and the children of a victim of employment discrimination have a cause of action in tort against an individual working in the employer's human resources area, who is not individually liable under employment discrimination statutes but allegedly discriminated against the victim, for the damages resulting from his discriminatory acts.

Plaintiffs aver that such action in tort may be maintained and rely on the Puerto Rico Supreme Court's decision in *Santini v. Serv Air,* 94 JTS 121, which acknowledged the existence of a cause of action in tort under Article 1802 of the Puerto Rico Civil Code "precisely in those instances where the special statutes did not afford such cause of action." (Pls' Opp'n to Defs' Mot. Dismiss Claims Against Clotilde Mena at ¶ 4a). According to Plaintiffs, a tort action is premised on principles of civil responsibility which call for the redress of "every harm, material or moral, if there are three requisites or elements: (i) that a

2. Even though Plaintiffs have voluntarily withdrawn these claims, the March 2nd Order dismissed all employment discrimination claims against Mena.

harm be suffered; (ii) that there be a causal nexus between the damage and the act or omission of the adverse party and; the act is intentional or negligent." (Mem. Supp. Pl's Opp'n Defs' Mot. Dismiss Claims Against Clotilde Mena at 6). Therefore, Plaintiffs conclude that so long as these three elements are met a wronged individual will have an action in tort, regardless of whether he is the relative of the individual who was directly wronged. Mena disagrees with Plaintiffs stating that, although Vélez, Mónica, and Juan's 1802 action against Mena is independent from Ocasio's employment discrimination claims, such action in tort is contingent upon Ocasio proving discrimination. (Rep. Pls' Opp'n Mot. Requesting Dismissal Claims Against Clotilde Mena at 15).

█ Several Puerto Rico Supreme Court decisions have dealt with the issue at bar. The Court refers to a trilogy of Supreme Court cases which shed some light on the foregoing discussion: *Maldonado Rodríguez v. Banco Central*, 138 D.P.R. —— (1995), 95 TSPR 44; *Martínez Campos v. Banco de Ponce*, 138 D.P.R. —— (1995), 95 TSPR 47; *Santini v. Serv Air, Inc.*, 94 J.T.S. 121. The *Santini* Court determined whether the relatives of a person, whose supervisor forced him to quit his job in violation of Law 100, have a cause of action in tort under Article 1802 of the Puerto Rico Civil Code. Plaintiffs were Ramón Santini, who was the employee and victim of discrimination, his parents, and his girlfriend. Santini's action arose under Law 100, Puerto Rico's statutory counterpart to Title VII. Law 100's legislative intent, however, is limited in its scope with regards to standing. Its purpose, the Supreme Court noted, is to protect employees, not to create a cause of action for a victim's relatives. The Supreme Court, however, recognized the broad scope of Article 1802, which states that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R.Laws Ann. tit. 31, § 5141. Notwithstanding this broad scope, the Court finds that the Supreme Court was clear in mentioning that the relatives' cause of action in tort derives from or is contingent upon the victim's cause of action.[3] The *Martínez Campos* and *Maldonado Rodríguez* decisions more explicitly address the issue at bar than *Santini,* stating that a person's cause of action in tort is contingent upon his relative's cause of action under the employment discrimination statute.[4] Therefore, pursuant to the controlling case law, Vélez, Mónica, and Juan's cause of action in tort against Mena hinges not on whether Mena in fact discriminated against Ocasio, but on whether Ocasio has a cause of action against Mena under the employment statutes. Therefore, because the Court dismissed all of Ocasio's claims against Mena in its March 2nd Order, the cause of action

---

3. Stating in Spanish, "[p]or los fundamentos antes expresados, resolvemos que en Puerto Rico, los parientes de un empleado que ha sido víctima de trato discriminatorio por su patrono *bajo la Ley 100*, tienen una cause de accion propia bajo el Artículo 1802 del Código Civil ...."(emphasis added) (translated into English, for all of the reasons stated above, we hold that in Puerto Rico, the relatives of an employee who has been the victim of discriminatory treatment by his employer under Law 100, have a cause of action under Article 1802 of the Civil Code (translation ours)).

4. In *Maldonado Rodríguez* the Court stated in Spanish that "existe una causa de acción del cónyuge del empleado discrimado bajo el Artículo 1802 *contingente a la acción del consorte discriminado bajo la Ley Núm. 100."* ((emphasis added) (translated into English, the spouse of the employee who was discriminated against has a cause of action under Article 1802 which is contingent to that of her spouse) (translation ours)). Likewise, the *Martínez* Court held that the spouse "podría tener una causa de acción por sus propios daños, contingente a la *causa de acción del obrero discriminado bajo la Ley Núm. 100."* ((emphasis added) (translated into English that the spouse could have a cause of accion to recover for her own damages, which is contingent to the employee's (her husband's) cause of action under Law 100) (translation ours))

in tort brought by Vélez, Mónica, and Juan cannot continue.

The Court further finds that allowing Vélez, Mónica, and Juan's action in tort could set a dangerous precedent. Permitting relatives to recover in tort against a supervisor who is otherwise not subject to liability under the anti-discrimination laws could lead victims of discrimination to include relatives as co-plaintiffs in order to recover indirectly against supervisors. The Court finds that allowing such actions in tort would circumvent the legislative intent of not providing for individual liability.

In view of the above reasoning, the Court hereby **DISMISSES** Vélez, Mónica, and Juan's cause of action against Mena under Article 1802 of the Puerto Rico Civil Code.

### 2. *Law 44 Claims Against Mena*

Because the Court finds that Plaintiffs in their Complaint omitted the cite of Law No. 44 but that it was their intention to incorporate such cause of action in their Complaint, the Court hereby admits the Amended Complaint. Therefore, Plaintiff's Motion Requesting Leave to Amend Complaint to incorporate the Law 44 cause of action is hereby **GRANTED. (docket No. 14)**. This being said, Ocasio has brought a claim against Bristol and Mena under Law No. 44 of July 2, 1985, P.R.Laws Ann. tit. 1 §§ 501–511. ("Law 44") which prohibits discrimination in the workplace against the physically or mentally disabled. Mena states, however, that the Court should dismiss Ocasio's Law 44 claim against her because she is not an employer as defined in the statute and therefore cannot be held liable for damages.

The Court, however, finds that Law 44 does not only apply to employers, but its scope appears to be somewhat broader. Section 5 of Law 44, addressing discrimination in the workplace, states that *"[p]rivate or public institutions* shall not practice, put into effect or use discriminatory

employment procedures, methods, or practices against persons with physical or mental disabilities just for the sake of said handicap." P.R.Laws Ann. tit. 1 § 505 (emphasis ours). Because the proscribed behavior is addressed to "public and private institutions," defining such term is essential to our discussion. Law 44 defines "public and private institutions" as "any association, society, federation, institute, entity or *natural* or juridical *person* that carries out, offers or renders any service, program, or activity regardless of whether or not it receives any financial contribution or funds from the Government of Puerto Rico." P.R.Laws Ann. tit. 1 § 501(c) (translation ours) (emphasis added). Because this definition includes natural persons providing services, Mena as an employee could plausibly fall within the scope of public or private institution. *See* P.R.Laws Ann. tit. 31 § 82.

■ Even if Mena is required to follow Law 44, it does not necessarily follow that she is subject to liability under such statute. *See Santiago v. Lloyd,* 1998 WL 957775 *5 (D.Puerto Rico) (Pieras, J.); *Figueroa v. Mateco,* 939 F.Supp. 106 (D.Puerto Rico 1996). Although the case law relating to remedies under Law 44 is limited, section 13 of Law 44 provides guidance stating that the remedies created by Law 100, the Puerto Rico counterpart to Title VII, are applicable to Law 44. *See* P.R.Laws Ann. tit. 1 § 511; *Rivera Flores v. Compañía ABC H/N/C, McGaw of PR,* 95 J.T.S. 2. In view of this incorporation of remedies, the Court refers to Law 100 and its relevant case law as it relates to damages and remedies.

In its remedies section, Law 100 states that "any employer who … discriminates against an employee regarding his salary, wage, pay or remuneration, terms, rank, conditions, or privileges of his work, … or who limits … his employees in any manner which tends to deprive a person of employment opportunities, or to affect his status as employee, on the basis of age,

... race, color, sex, or national origin, or social position ... shall incur civil liability...." P.R.Laws Ann. tit. 29, § 146. In applying this section, the decisions of this District hold that Law 100 does not provide for the imposition of damages on supervisors or agents of employers. *See, Santiago v. Lloyd,* 1998 WL 957775 *5 (D.Puerto Rico) (Pieras, J.); *Figueroa v. Mateco,* 939 F.Supp. 106 (D.Puerto Rico 1996). "The purpose of including the chiefs, officials, managers, officers, administrators, and others [in the definition of employer] is to make the employer responsible for their conduct." *Figueroa* 939 F.Supp. 107 (quoting *Secretary of Labor v. Ibarra García,* 88 P.R.R. 494, 498 (1963), in which the Puerto Rico Supreme Court rejects the imposition of individual liability in the context of the minimum wage law and concludes that the definition of employer is expansive to ensure *respondeat superior* liability on employers for the acts of their agents). Therefore, because the concept of liability and remedies in Law 44 parallels that of Law 100, the Court finds that Mena should not be liable under Law 100.

Further, the Puerto Rico legislature, by amending Law 44 in late 1991, sought to accommodate local law with the Americans with Disabilities Act, its federal counterpart. *See* 1991 P.R.Laws 105; *Ríos Jaimán v. Cidra Manufacturing Operations of P.R., Inc.,* 98 J.T.S. 73. The case law in this District establishes that an agent is not individually liable under ADA, but rather the employer, in this case Bristol, is subject to liability under ADA for the acts of its agents. *See Figueroa v. Fajardo,* 1 F.Supp.2d 117, 120 (D.Puerto Rico 1998); *Rivera Rodríguez v. Police Department of Puerto Rico,* 968 F.Supp. 783, 785 (D.Puerto Rico 1997) (Pieras, J.); *Rodríguez Moreno v. John Crane, Inc.,* 963 F.Supp. 72, 76 (D.Puerto Rico 1997); *Flamand v. American International Group.,* 876 F.Supp. 356, 361–64 (D.Puerto Rico 1994). Therefore, if the Puerto Rico legislature sought to provide for a local equivalent to the Americans with Disabilities Act,

an act which does not provide for individual liability, the text and legislative history of Law 44 should have been more specific and explicit. In view of the above discussion, the Court hereby **DISMISSES** Plaintiff's Law 44 Claim against Mena.

**B. Plaintiff's Motion Regarding ISC**

The Court has before it Plaintiffs' Motion Requesting Amendment of Initial Scheduling Conference Order (**docket No. 24**). Plaintiffs ask the Court to strike thirteen itemized facts which the Court listed in its Initial Scheduling Conference Order to be uncontroverted. Plaintiffs, however, do not specify which facts in particular are still controverted. For the reasons that follow, this Motion is hereby **DENIED.**

The Court does not prepare the Initial Scheduling Conference ("ISC") Order in a mechanical manner. In determining which are uncontested facts, the Court looks not only at the proposed stipulations of fact, but also considers and looks for a common ground in the allegations of the parties, the ISC memoranda, and the discussions had during the Initial Scheduling Conference. If there is no discrepancy, the Court enters a finding that the parties agree such facts are still contested. Finding that facts are uncontroverted does not necessarily result from a verbal statement or description from the parties as to the fact that "we agree to this or that," but rather that there is no discrepancy as to certain specific facts, that therefore the facts are agreed to by the parties, and proof of the same at trial is not necessary.

The parties must be proactive in searching for common ground in order to avoid burdening themselves, the Court, and the jury with issues in which the parties are already in agreement. Further, the parties cannot expect the Court, which aims to please, to favorably entertain a Motion including open-ended and ambiguous prayers, like Plaintiffs have done. The Court is trying to incorporate the parties into the

wave of the future of finding the truth which would be the basis for settlement in the only way it can be done, with knowledge of facts. In addition, finding the truth will enable the parties to be ready for trial with knowledge of all facts agreed to and where the parties differ, and this could save the parties and the Court time, cost, delay, and resources. The Court believes that emphasizing technicalities that work to unintentionally obstruct the search for the truth is unproductive.

The case management procedures incorporated by Congress in the Civil Justice Reform Act exemplifies the spirit of this statute which is to avoid cost and delays. This intent is implemented through conferences such as our Initial Scheduling Conference. These case management procedures were covered in the Order of the Committee of this District on the Civil Justice Reform Act. The Court asks the parties to help it work towards these ends and reduce cost and dely. Notwithstanding the discussion above, the Court now revisits the documents on the record to ensure that the parties are in agreement as to the facts itemized in the ISC Order as uncontested.

The first fact over which the parties are in agreement is that "Plaintiff Ocasio worked for Defendant Bristol Myers Squibb, Puerto Rico ('Bristol') as a Sales Representative." (ISC Order at 1). Plaintiffs stated the following in their ISC Memo "Plaintiff ... Ocasio ... commenced working defendant Bristol on May 1, 1988 as a Sales Representative." (Pls.' ISC Mem. at 3). Defendants agree with Plaintiffs stating in their ISC Memo that "[p]laintiff worked for defendant as a Sales Representative." (Defs.' ISC Mem. at 2). Therefore, the parties are in agreement as to the position held by Ocasio at Bristol.

The second fact that the Court included as agreed upon by the parties was that "Ocasio was put on probation by Bristol in April 1996." (ISC Order at 1). Plaintiffs state in their Memo that "In April of 1995, [P]laintiff [Ocasio] began suffering from a major depression and unbeknownst to her, from a brain tumor.... During this time, plaintiff's supervisor from Bristol called her to a meeting ... and placed her on probation." Plaintiffs narrate the alleged facts in a chronological fashion, the next allegations deal with events in May of 1996. This can only suggest that the probation took place in April. Defendants agree with this version of the facts stating that "On April 18, 1996, Plaintiff Dilcia Ocasio ... signed a performance improvement plan, which placed her on probation." (Defs.' ISC Mem. at 31). The Court, therefore, finds that the parties were in agreement as to Ocasio's probation and the date of such probation.

Third, the Court stated that the parties agree that "Plaintiff Ocasio was diagnosed with a cerebral tumor on or about April 29, 1996." (ISC Order at 2). The Court noted at the time that there was some disagreement between the parties as to the date, stating in a footnote that while Plaintiffs stated that such diagnosis took place in May of 1996, Defendants stated that Ocasio received the results of a brain radiology scan on or after April 29, 1996. Plaintiffs in their ISC Memo stated that "[i]n the month of May of 1996, Mrs. Ocasio was diagnosed with a cerebral tumor called cavernous sinus meningioma by Dr. Jenaro Scarano." (Pls.' ISC Mem. 3–4). Further, Plaintiffs' Complaint states that "[s]ince the date of employment, and for eight years, [P]laintiff [Ocasio] ... performed her duties in a ... good manner except for the period immediately preceding the diagnosis of a brain tumor." (Pls.' Compl. at 4). Defendants admit that Ocasio was diagnosed with a brain tumor in their answer to the Complaint and in their ISC Memo stating that on April 29, 1996 Plaintiff received the results of a brain radiology scan. Therefore, the Court finds that there is no controversy as to the diagnosis of Ocasio's brain tumor.

The Court also finds that no controversy exists between the parties as to the fourth fact in the ISC Order, which states that

"[i]n June 1996, Ocasio traveled to the U.S. to receive gamma knife surgery as treatment for her brain tumor." (ISC Order at 2). This fact was practically copied verbatim from Plaintiffs' ISC Memo stating that "[i]n June of 1996, [P]laintiff ... Ocasio ... traveled to the United States to receive gamma knife surgery as treatment for the tumor in her brain." (Pls.' ISC Mem. at 4). Defendants admitted this fact in their Answer to the Amended Complaint. (Defs.' Ans. at ¶ 17). Thus, no controversy exists as to this fact.

Fifth, the Court stated in its ISC Order that "Clotilde Mena was the Human Resources director at for [sic] Bristol." (ISC Order at 2). Plaintiffs stated in their ISC Memo that "Mena was at all times relevant to this Complaint an employee of defendant Bristol and was the Human Resources Officer." (Pls.' ISC Mem. at 2). Defendants state that Mena was the Human Resources Manager. (Defs' ISC Mem. at 35). Although the Court believes that the difference of Director, Officer, and Manager does not appear to make much of a difference in this case because Mena is the only Human Resources employee referred to in the Complaint, the Court will amend the ISC Order to read that "Clotilde Mena worked for Bristol in the area of Human Resources."

The Court further found that the parties agreed that "Ocasio returned to Bristol Myers in October 1996 after being told that she could return to work." Plaintiffs state "Finally, [Ocasio] was told that she could return to work .... [and] on October 1, 1996, [she] returned to work as Sales Representative...." (Pls.' ISC Mem. at 4). Defendants agree that Ocasio returned to work on October 1st. (Defs' Ans. at ¶ 19; Defs' ISC Mem. at 32). Therefore, the Court finds that the parties agree that Ocasio returned to work at Bristol on October 1, 1996.

The parties further agree that "[i]n November 1996 Ocasio requested certain accommodations because of her alleged health problems." (ISC Order at 2).

Plaintiffs stated that "[o]n November 22, 1996[P]laintiff ... Ocasio requested reasonable accommodation from her employer ... due to difficulties stemming from her diagnosed condition." (Pls' ISC Mem. at 4). Defendants admit that "Dilcia Ocasio requested an accommodation which was not reasonable, through a memorandum dated November 20, 1996." (Defs' Ans. at ¶ 20). Although Defendants state that such accommodation was not reasonable, the Court, in stating that the parties agreed that Ocasio asked for reasonable accommodation, meant that Ocasio asked for what she thought was reasonable. In view of this clarification the Court shall not amend the ISC Order and finds the parties to be in agreement as to this fact.

The eighth fact as to which no controversy exists is that "[o]n December 11, 1996, Ocasio had a meeting with Bristol officials to discuss her conditions and accommodations." (ISC Order at 2). Defendants state that on such date, "Company officials met with Plaintiff." (Defs' ISC Mem. at 34). Plaintiffs, however, state that on such date defendant "took away all of plaintiff's responsibilities." (Pls' ISC Mem. at 4). Although the Court agrees that from their statement, Plaintiffs do not necessarily subscribe to the proposition that on December 11, 1996 Ocasio in fact met with Bristol officials to discuss her conditions and accommodations, the Court hereby **ORDERS** the parties to inform the Court on or before **May 4, 1999** whether they stipulate to the Court's interpretation of this issue.

The ninth fact is that on "March 13, 1997, Ocasio sent Bristol a memorandum asking for reinstatement." (ISC Order at 2). Plaintiffs state that "[o]n March 13, 1997, upon realizing that defendant Bristol would not consider her verbal request for reasonable accommodation, plaintiff submitted her request in writing.... She also requested reinstatement to her position." (Pls' ISC Mem. 5 and 14). Defendants admit that on "March 13, 1997, Dilcia Ocasio requested that she be reinstated...."

(Defs' Ans. at ¶ 24). Therefore, the Court finds that the parties are in agreement as to this fact.

The Court also stated that "[o]n March 26, 1997, Ocasio and Mena had a meeting to discuss Ocasio's accommodations." (ISC Order at 2). The Court finds that the parties agree on this fact as evidenced by their ISC Memos. (Pls' ISC Memo at 5; Defs' ISC Memo at 35).

Fact number 11 reads, "Manuel López Cepero was Ocasio's supervisor at Bristol for a period of time during her tenure." Both parties refer to Mr. López Cepero as Ocasio's supervisor in their ISC Memos. (Pls' ISC Mem. at 5; Defs' ISC Mem. at 32). Therefore, the Court finds no controversy exists as to Mr. López Cepero's role in this case.

Fact number 12 reads that "Ocasio was replaced by a male individual." (ISC Order at 2). The Court finds that this constitutes one of Plaintiffs' main contentions to demonstrate gender based discrimination. They state that "[d]uring her absence and after being dismissed, Plaintiff Dilcia Ocasio was permanently replaced by a male employee." (Pls' ISC Mem. at 8). Defendants agree that Ocasio was replaced by a male employee. They state that "[a]fter [Plaintiff |Ocasio] went on leave, defendant hired a temporary person to cover the area. This person's name is·José E. Torres Morales.... After [Ocasio] abandoned her job.... Torres was hired as a regular employee of defendant on August 1, 1997." (Defs' ISC Mem. at 32). Although in their Answer to the Amended Complaint, Defendants disagree with Plaintiffs contention that "during her absence and after being dismissed, Plaintiff ... Ocasio was permanently replaced by a male employee," they agree that during her leave defendant used a temporary male employee to cover her route who was hired after Ocasio's discharge. (Defs' Ans. at ¶ 44; Defs' ISC Mem. at 32). Therefore, the Court finds that the parties are in agreement as to the Court's as to fact number 12.

Finally, the Court stated in its ISC Order that the parties agreed that "Bristol forwarded Ocasio a letter of termination dated May 28, 1997 for abandoning her post." (ISC Order at·3). Plaintiffs state that "[o]n May 28, 1997, Bristol sent Dilcia Ocasio a letter stating that she was fired because she had 'abandoned her work' ". (Pls' ISC Mem. at 14). Defendants state that Ocasio "was notified, through a letter dated May 28, 1997, that she could no longer be kept on the Company's payroll record, and that the Company had determined that she had abandoned her post." (Defs' ISC Mem. at 36). Thus, the parties are in agreement as to the date of the termination letter and the reason stated by Bristol for such termination.

## IV. *CONCLUSION*

In view of the discussion above, the Court hereby **DISMISSES** Vélez, Mónica, and Juan's cause of action against Mena under Article 1802 of the Puerto Rico Civil Code; Plaintiffs' Law 44 claim against Mena. Further, the Court hereby **DENIES** Plaintiffs' Motion Requesting Amendment of Initial Scheduling Conference Order

IT IS SO ORDERED.