The **PORTS AUTHORITY OF PUERTO RICO, et al.,** Plaintiffs,

v.

**COMPAÑIA PANAMEÑA DE AVIACION (COPA), S.A.,** Defendant.

No. Civ 99–1336 JP.

United States District Court, D. Puerto Rico.

Nov. 22, 1999.

Francisco Fernández Alvarez, Hato Rey, P.R., Diego A. Ramos Cayon, Fiddler, González & Rodríguez, San Juan, P.R., for plaintiff.

Francisco M. Troncoso Cortés, Troncoso & Becker, San Juan, P.R., for defendant.

## *OPINION AND ORDER*

PIERAS, Senior District Judge.

Before the Court is co-Plaintiff American Airlines, Inc.'s ("American") Motion to

---

**3.** *See also* plaintiff's opposition (docket No. 34); defendant's Reply (docket No. 41) and plaintiff's Sur–Reply (docket No. 42).

Dismiss COPA's Counterclaim (**docket No. 16**), Defendant Compañía Panameña de Aviación, S.A.'s ("COPA") Opposition to American's Motion to Dismiss COPA's Antitrust Claims (docket No. 45), and American's Reply thereto (docket No. 56).

## I. BACKGROUND

Plaintiffs American and The Ports Authority of Puerto Rico ("Ports Authority") have brought this action against COPA for unjust enrichment and declaratory relief arising from COPA's non-payment of a fee for the use of the Federal Inspection Service Facility ("FIS Facility") located at the Luis Muñoz Marín International Airport ("LMM Airport") in San Juan, Puerto Rico. COPA filed a counterclaim alleging antitrust violations.

More specifically, COPA alleges in its counterclaim that (1) the Ports Authority had abdicated its regulatory duties and powers conferred by the Puerto Rico Ports Authority Act over the FIS Facility at the LMM Airport in favor of American, without retaining any regulatory oversight, thus constituting an unreasonable "hybrid" restraint of trade in violation of section 1 of the Sherman Act; (2) American's contractual demands, whereby it conditioned the building of a new FIS Facility at the LMM Airport on the Ports Authority's closing of the old FIS Facility and granting to American the exclusive right to set the fees for the use of the new FIS Facility, constitute illegal "tying," also in violation of the Sherman Act; and (3) the Ports Authority illegally granted American "monopoly power" to exclude its competitors from the LMM Airport in violation of section 2 of the Sherman Act.

In its Motion to Dismiss, American argues that (1) American and Ports Authority are entitled to immunity from antitrust liability under the state action doctrine; (2) the "Noerr–Pennington Doctrine" immunizes American's outsourcing arrangement with the Ports Authority; and (3) COPA has failed to state an antitrust claim because there is no antitrust injury.

In its counterclaim, COPA first requests that pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court enter a declaratory judgment holding that the provisions of the agreement between the Ports Authority and American on June 12, 1996, and American's attempts to set, charge, and collect tariffs for the use of its FIS Facility as well as the tariffs enacted by the Ports Authority pursuant to its contractual obligations with American are illegal under the Sherman Antitrust Act, 15 U.S.C. §§ 1–7; 49 U.S.C. §§ 40116–40117, 47101, and the federal regulations enacted thereunder; and the Puerto Rico Ports Authority Act, P.R.Laws Ann. tit. 23, §§ 331–354. Second, COPA requests that the contract entered into by American and the Ports Authority be declared null and void under Articles 1227 and 1252 of the Puerto Rico Civil Code, P.R.Laws Ann. tit. 31, §§ 3432 and 3511. Third, COPA requests injunctive relief enjoining American from attempting to set, charge, and collect tariffs for the use of the FIS Facility, as well as from threatening COPA that it will bar the entry of its passengers. Finally, COPA seeks reimbursement for the costs incurred in filing its counterclaim.

## II. LEGAL STANDARD AND FACTUAL ALLEGATIONS

### A. Standard for Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may, in response to an initial pleading, file a motion to dismiss the complaint for failure to state a claim upon which relief can be granted. It is well-settled, however, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Miranda v. Ponce Fed. Bank*, 948 F.2d 41 (1st Cir. 1991). The Court must accept as true "all well-pleaded factual averments and in-

dulg[e] all reasonable inferences in the plaintiff's favor." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir.1996) (citations omitted); *see also Berríos v. Bristol Myers Squibb Caribbean Corp.*, 51 F.Supp.2d 61 (D. Puerto Rico 1999) (Pieras, J.). A Complaint must set forth "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable theory." *Romero–Barceló v. Hernández–Agosto*, 75 F.3d 23, 28 n. 2 (1st Cir.1996) (quoting *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir.1988)). The Court, however, need not accept a complaint's " 'bald assertions' or legal conclusions" when assessing a motion to dismiss. *Abbott, III v. United States*, 144 F.3d 1, 2 (1st Cir.1998) (citing *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir.1996)). It is with this framework in mind that the Court will assess the motion before it.

### B. COPA's Allegations

Pursuant to the legal standard set forth above, the following facts are taken as true for purposes of this motion to dismiss. COPA is a corporation organized and existing under the laws of the Republic of Panama and is engaged in the transportation of passengers for hire to and from Puerto Rico and other foreign destinations, among other routes it operates throughout the world. American and COPA are direct competitors in the air travel industry. At the LMM Airport, American's share of the air travel market is approximately 70%, while COPA's share is negligible.

Under the authority conferred by the Puerto Rico Ports Authority Act, P.R.Laws Ann. tit. 23, § 331, and the regulatory Tariffs issued pursuant to this authority, the Ports Authority leased certain premises to COPA at the LMM Airport for the operation of scheduled flights between Puerto Rico and various international destinations. The sums paid by COPA for the use of the facilities at LMM Airport were to be established by the Tariffs enacted by the Ports Authority under the regulatory duties conferred by the Ports Authority Act.

At the time of the agreement between the Ports Authority and COPA, there were two FIS Facilities at the LMM Airport. One was located at Terminal B and used by COPA and other airlines. The second FIS Facility was located at Terminal C and used by American. The Ports Authority charged COPA $2.41 per inbound passenger for the use of the facilities at Terminal B, including the FIS Facility.

In May 1997, the Ports Authority notified COPA and the other international airlines that effective June 1, 1997, the FIS Facilities at Terminal B would be closed, and that all international airlines would be required to use the FIS Facility at Terminal C. At the time, the Ports Authority did not advise COPA of any changes in its regulatory Tariffs that would entail an increase in the fees charged for the use of FIS Facilities at the LMM Airport.

By letter dated March 27, 1998, the Ports Authority informed COPA that in addition to the Tariffs that Port Authority had been charging for inbound passengers, American would charge a fee of $5.66 per inbound passenger. The letter indicated that the $5.66 per passenger fee was retroactive to June 1, 1997. The Ports Authority acknowledged that the $5.66 figure was different from that which American had demanded. Further, if the payment was not made, the letter indicated that American would bar COPA's passengers from access to the FIS Facility. This in turn would essentially bar COPA's passengers from entry into the United States. The $5.66 fee demanded by American is in addition to the fees already charged by the Ports Authority, U.S. Customs Service, U.S. Immigration and Naturalization Service, and U.S. Department of Agriculture.

COPA asserts that the Ports Authority has abdicated its regulatory duties and powers conferred by the Puerto Rico Ports Authority Act over the FIS facilities at the LMM International Airport in favor of

American, without retaining any regulatory oversights. The Ports Authority does not have the authority to review the reasonableness of the fees set by American before they go into effect or the terms of the contract American insists its competitors sign. American has been exempted from the charges. Thus, the Ports Authority has granted American the ability to control and regulate the international air travel market at the LMM Airport.

### C. Uncontested Facts

In addition to the facts alleged by COPA, the Court takes notice of the following facts, to which the parties previously stipulated:

1. The Authority is an instrumentality of the Commonwealth of Puerto Rico, created by virtue of the Puerto Rico Ports Authority Act, P.R.Laws Ann. tit. 23, §§ 331–354.

2. American is a corporation organized in Delaware, with its principal place of business in Fort Worth, Texas. American transports passengers to and from Puerto Rico by aircraft from and to airports in the United States and foreign countries.

3. COPA is a corporation organized in Panama. COPA transports passengers to and from Puerto Rico and other foreign countries.

4. To the extent American and COPA fly and serve the same markets for foreign passengers, or could expand their operations to serve those same markets, American and COPA are competitors or could be competitors in those markets.

5. COPA is a significant competitor of American in international air travel in the routes to and from San Juan and Santo Domingo, Dominican Republic, and San Juan and Central America.

6. According to public statistics kept by the Ports Authority and other federal regulatory agencies, airlines other than American and its affiliate, Executive Airlines, Inc., d/b/a American Eagle, transport about 30% of the passengers traveling in and out of LMM Airport. In other words, American transports approximately 70% of the passengers in and out of LMM Airport.

7. The Ports Authority owns, regulates and administers all the facilities and services related to the transportation of goods and passengers to and from Puerto Rico, including the LMM Airport, by operation of state law, P.R.Laws Ann. tit. 23, §§ 331–354.

8. Pursuant to its enabling Act, P.R.Laws Ann. tit. 23, §§ 331–354, the Ports Authority has adopted regulations, contracts and tariffs regulating the use of all the facilities at the LMM International Airport; who has to pay for the use of those facilities; who can build, operate and maintain those facilities; and how much has to be paid for the use of those facilities.

9. Under the authority conferred by the Puerto Rico Ports Authority Act, P.R.Laws Ann. tit. 23, §§ 331–354, and the regulatory tariffs issued pursuant thereto, on December 14, 1995, the Ports Authority leased counter space to COPA in order to sell tickets and service clients. The amounts to be paid by COPA for the use of the above-mentioned facilities at the LMM Airport, were those to be established by the tariffs enacted by the Ports Authority under the regulatory duties conferred by the Puerto Rico Ports Authority Act.

10. As an operator of scheduled flights to and from Puerto Rico and international destinations and Puerto Rico being the point of entry into the United States of COPA's flights, the Ports Authority facility used by COPA at the LMM Airport as of 1995 for its passengers to

enter the United States was the Federal Inspection Service facilities located at the International Terminal (formerly known as the Eastern Airlines terminal or Terminal B).

11. At the time of the agreement between the Ports Authority and COPA, there were two FIS facilities at the LMM Airport, one at the International Terminal (Terminal B) used by COPA and other airlines, and another at Terminal C used by American.

12. Until June 1997, the Ports Authority operated and allowed American Airlines to operate two FIS facilities at the LMM Airport.

13. One of those FIS facilities was built by the former Eastern Airlines and it was operated and maintained by the Authority. The other FIS facility was built, operated and maintained by American.

14. COPA passengers were processed by federal authorities through the old FIS facilities operated by the Authority until June 1997.

15. American has charged $5.66 per arriving international passenger for the use of its FIS facilities during the second half of 1997 and throughout 1998.

16. On numerous occasions, American has threatened that it would bar the entry of COPA's passengers to the United States unless COPA agrees to pay American the sum of $5.66 per inbound passenger.

17. Pursuant to the authority conferred on American by the Ports Authority under the June 12, 1996 agreement, American has demanded payment from its competitors that operate international flights and are required to use the FIS facilities of the LMM Airport to enter the United States, that they sign an agreement with American wherein they consent to the payment of the $5.66 per inbound tariff to American.

18. American has demanded from COPA and its other competitors information on the actual number of passengers arriving on each flight, that COPA name American as an additional named insured in its liability insurance policy and that it hold harmless American from any liability for the use of the FIS facilities at the LMM Airport.

19. Beginning January 1, 1999, the fee for using its FIS facility at LMM Airport increased by 22 cents per person.

20. All information about the number of passengers deplaning from an international flight at any airport of the United States is public information kept by operation of law by several federal agencies.

21. The Ports Authority enacted public resolutions and tariffs for the fees for use of its facilities during 1997.

22. The Ports Authority enacted Tariff A–3–2, effective during 1997, prohibiting anyone at the LMM Airport to collect any different tariff "unless a specific contract has been signed with the Authority and/or prior written consent has been obtained from the Authority."

23. On February 19, 1997, the Ports Authority adopted Emergency Resolution No. 97–12.

24. The following list includes the number of COPA passengers processed through the American FIS facility from June 1997 through February 1999.

1997

| | |
|---|---|
| June | 6,644 |
| July | 7,756 |
| August | 7,047 |
| September | 5,562 |
| October | 6,149 |
| November | 6,199 |
| December | 5,596 |

1998

| | |
|---|---|
| January | 6,776 |
| February | 5,682 |
| March | 6,472 |
| April | 5,810 |
| May | 5,057 |
| June | 7,969 |
| July | 9,596 |
| August | 8,092 |
| September | 4,975 |
| October | 4,694 |
| November | 4,937 |
| December | 4,704 |

1999

| | |
|---|---|
| January | 6,880 |
| February | 5,258 |

25. During the months of March, April and May 1999, COPA processed more than 15,000 passengers through the FIS facility in LMM Airport.

26. On or about March 31, 1998, American delivered to COPA invoice number 1800009358 in the amount of $279,145.54 for the use of the FIS facilities in LMM Airport.

27. On or about July 28, 1998, American delivered to COPA invoice number 9900083543 in the amount of $175,324.16 for the use of the FIS facilities in LMM Airport.

28. On or about November 16, 1998, American delivered to COPA invoice number 9900120906 in the amount of $161,530.74 for the use of the FIS facilities in LMM Airport.

29. On or about January 15, 1999, American delivered to COPA invoice number 9900138702 in the amount of $26,839.72 for the use of the FIS facilities in LMM Airport.

30. On or about March 16, 1999, American delivered to COPA invoice number 9900155008 in the amount of $41,561.38 for the use of the FIS facilities in LMM Airport.

31. COPA has not paid any of the invoices delivered by American for the use by COPA's passengers of the new FIS facilities built and operated by American because it understands the fee is illegal.

32. From January 1, 1999 until May 31, 1999, more than 27,000 COPA passengers used the new FIS facilities built and operated by American.

33. On March 27, 1998, the Ports Authority sent a letter to COPA regarding the payment of FIS facility usage fees.

34. The FIS fee charged by American is to be paid by FIS users in addition to any unrelated Authority charges for the use of airport gates and premises as well as any other unrelated charges by United States governmental authorities.

35. American entered into an agreement with the Ports Authority dated June 12, 1996, under which American agreed to build a new FIS facility.

36. The agreement that American has requested that its competitors sign for the use of the FIS facilities at the LMM Airport included the following provision:

FIS Fee. American and the User [the competitor] acknowledge that the initial estimated Cost Per Passenger (as defined, on Exhibit "A") shall be $5.66 through December 31, 1997 and will be adjusted by American on annual basis as of the first day of each year thereafter commencing on January 1, 1998 according to the formula presented in Exhibit "A."

### III. "STATE ACTION" DOCTRINE

■ American contends that it enjoys antitrust immunity under the "state action" doctrine. State action immunity is in the nature of an affirmative defense; the party claiming immunity has the burden of proof. *See Ticor II*, 112 S.Ct. at 2172; *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 37–39, 105 S.Ct. 1713, 1716, 85

L.Ed.2d 24 (1985); *Federal Maritime Comm'n v. Seatrain Lines, Inc.,* 411 U.S. 726, 731–33, 93 S.Ct. 1773, 1778, 36 L.Ed.2d 620 (1973); *Yeager's Fuel v. Pennsylvania Power & Light,* 22 F.3d 1260, 1267 (3d Cir.1994). American argues that it is entitled to state action immunity because the conduct challenged by COPA is undertaken pursuant to a clearly articulated state policy that is actively supervised by the state itself. *See California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980).

Section 1 of the Sherman Act provides that "every contract, combination ... or conspiracy, in restraint of trade or commerce among the several States" shall be unlawful. 15 U.S.C. § 1 (1997). Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." *Id.,* § 2.

■ The "state action" doctrine, in the context of antitrust law, confers antitrust immunity on states, municipalities, and agents or instrumentalities of states or municipalities in certain circumstances. The United States Supreme Court has cautioned, however, that "state-action immunity is disfavored...." *Federal Trade Comm'n v. Ticor Title Ins. Co.,* 504 U.S. 621, 636, 112 S.Ct. 2169, 2178, 119 L.Ed.2d 410 (1992). The doctrine is rooted in the case of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), which established that the Sherman Act was not intended to reach activities directed by a state legislature. *Parker,* 317 U.S. at 350–51, 63 S.Ct. at 313. The Supreme Court later expanded the scope of *Parker,* finding that municipalities also enjoyed antitrust immunity. *See Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (opinion of Brennan, J.).

■ A two-prong test governs antitrust immunity under *Parker* when the actions of private parties are challenged. "First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; second, the policy must be actively supervised by the State itself." *Ticor,* 504 U.S. at 633, 112 S.Ct. at 2176 (quoting *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980)). The first prong is satisfied where the legislative policy is "forthrightly stated and clear in its purpose" to permit activities that would otherwise run afoul of the Sherman Act. *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943.

The Puerto Rico Legislative Assembly has clearly articulated a state policy to displace competition in the operation and management of air transportation facilities. In creating the Ports Authority, the Legislative Assembly vested it with the authority "to develop and improve, own, operate, and manage any and all types of air ... transportation facilities and services, ... and make available the benefits thereof in the most extensive and least costly manner...." P.R.Laws Ann. tit. 23, § 336 (1995). To this end, the Legislative Assembly granted the Ports Authority the power "to determine, fix, alter, charge and collect rates, fees, rentals and other charges for the use of the facilities or services of the Authority, or other commodities sold, rendered, or furnished by the Authority, which shall be fair and reasonable." *Id.* at § 336(1). The legislative policy to entrust to the Ports Authority the exclusive power to manage Puerto Rico's air transportation facilities has been forthrightly stated, in satisfaction of the first prong of the state action doctrine. *See Town of Hallie v. Eau Claire,* 471 U.S. 34, 43, 105 S.Ct. 1713, 1718, 85 L.Ed.2d 24 (1985).

The active supervision prong, on the other hand, "mandates that the State exercise ultimate control over the challenged anticompetitive conduct.... The active su-

pervision prong of the Midcal test requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." *Ticor,* 504 U.S. at 634, 112 S.Ct. at 2177 (quoting *Patrick v. Burget,* 486 U.S. 94, 100–01, 108 S.Ct. 1658, 1666, 100 L.Ed.2d 83 (1988)). The Supreme Court has made clear that the mere presence of some state involvement or monitoring is insufficient. *See id.* Rather, the touchstone is "whether the anticompetitive scheme is the State's own," such that the details of the rates or prices have been established by "deliberate state intervention, not simply by agreement among private parties." *Id.* at 634–35, 112 S.Ct. at 2177. The Supreme Court elaborated that where "prices or rates are set as an initial matter by private parties, subject only to a veto if the State chooses to exercise it, the party claiming the immunity must show that state officials have undertaken the necessary steps to determine the specifics of the price-setting or ratesetting scheme." *Id.* at 638, 112 S.Ct. at 2179.

American argues that the active supervision prong is satisfied in this case because the Ports Authority has played a substantial role in determining the specifics of American's operating policies. In particular, American points to the June 12, 1996 agreement ("Agreement") between the Ports Authority and American which provides for the construction and operation of a new FIS Facility by American, and authorizes American to charge other airlines a "reasonable, nondiscriminatory fee" for use of the Facility. *See* American's Motion to Dismiss, Exh. A, §§ 7.01, 9.08.

The Ports Authority set the initial FIS Facilities fee at $5.66 per passenger. The Agreement permits American to adjust the FIS fee on a yearly basis, and details a formula for calculating the fee. The formula requires American to charge a fee equal to the cost per passenger multiplied by the number of passengers using the FIS Facility each year. *See id.,* § 9.08(b).

The cost per passenger is determined by taking the sum of (1) the annual debt service payments made by American on account of the FIS Facility; (2) the annual maintenance cost for the FIS Facility, including baggage system maintenance costs; (3) the annual operating expenses for the FIS Facilities, such as utilities and cleaning expenses; (4) annual rent or other payments made by American to the Authority with respect to the FIS Facility; and (5) any and all other payments made or costs or taxes incurred by American in connection with the ownership, use or operation of the FIS Facility. *See id.*

In addition to establishing the initial FIS Facilities fee and detailing a formula for the yearly adjustment of the FIS fee, the Ports Authority built a supervisory mechanism into the Agreement. Section 6.01 of the agreement requires American to submit a monthly report to the Authority, setting forth "passenger, traffic and cargo data as may reasonably be requested by the Authority to determine the amount of any rental, fees or charges hereunder." *Id.,* § 6.01. Further, section 6.03 of the agreement provides that the Authority has the right to require the preparation of an annual independent audit, which might include a review of the passenger, traffic and cargo data supplied by American during the previous fiscal year. *See id.,* § 6.03. And in each year since American began managing the FIS Facility and charging a user fee, the Ports Authority has enacted public resolutions confirming American's power to collect a fee for each arriving international passenger using the Facility. *See id.*

COPA contends that the Ports Authority has failed to exercise active supervision over the setting of the FIS Facility fee. While the Ports Authority determined the initial FIS fee of $5.66 per inbound passenger, by contract it gave American the authority to unilaterally raise this fee each year without first submitting the change to Ports Authority for approval. On January 1, 1999, American raised the FIS fee from

$5.66 to $5.88 per inbound passenger without pre-approval or scrutiny by the Ports Authority. COPA concedes that Article 6(1) of the Puerto Rico Ports Authority Act provides that the Ports Authority shall conduct an economic study of its tariffs each year to determine if the fees being charged are reasonable. *See* P.R.Laws Ann. tit. 23, § 336(1). It argues, however, that while the Ports Authority annually conducts a detailed economic study of the reasonableness of the fees charged at the LMM Airport, these studies have not encompassed the FIS Facility fee that American charges its competitors. COPA further contends that other aspects of the supervisory scheme do not afford the Ports Authority any real supervisory powers over the setting, raising, and collection of the FIS fee by American.

In *Ticor*, the U.S. Supreme Court held that "[t]he mere potential for state supervision" is not enough to constitute active state supervision as required by *Midcal.* *See Ticor*, 504 U.S. at 638, 112 S.Ct. at 2179. *Ticor* involved a suit against six of the country's largest title insurance companies for price fixing in their fees for title searches and title examinations through rate bureaus. Each title insurance rate bureau was licensed by the State and authorized to establish rates for its member insurance companies. The rates set by these private parties went into effect automatically unless the regulatory agency chose to exercise a veto within a specified period of time. The findings of fact demonstrated that although a mechanism for regulatory review existed on a theoretical level, the agency failed to check many of the rate filings, and rates remained in effect despite the failure of the rating bureaus to provide additional information requested by the agency. *See id.* at 638, 112 S.Ct. at 2179. Thus, the agency did not in fact engage in active state supervision. *See id.* As a result, the Supreme Court held that the title insurance companies did not enjoy antitrust immunity. *See id.*

As in *Ticor*, the FIS Facility Fee established by American goes into effect automatically. A scheme exists for the Ports Authority to review the reasonableness of the FIS Fee, but that scheme neither subjects the determination of the FIS Fee to prior Ports Authority approval nor specifically grants Ports Authority veto power over the setting of the FIS Fee.

The present case, however, is distinguishable from *Ticor*. A detailed contractual formula leaves American virtually no discretion in the setting of the FIS Fee. In *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987), the Supreme Court struck down a New York statute providing that liquor retailers must charge at least 112% of the wholesaler's "posted" bottle price in effect at the time the retailer sells or offers to sell an item. Because each wholesaler set its own "posted" prices without supervision by the State, and New York did not engage in any monitoring of the price schedules, the Court held that the scheme did not satisfy the active supervision prong. *See id.* at 335–45, 107 S.Ct. at 725–26.

The Court noted, however, that a simple "minimum markup" statute requiring retailers to charge 112 percent of their actual wholesale cost may satisfy the "active supervision" requirement, presumably because it does away with the discretionary component present in the New York statute. *See id.* at 344 n. 6, 107 S.Ct. at 725. In that vein, the Court cited favorably *Morgan v. Division of Liquor Control*, 664 F.2d 353 (2d Cir.1981), in which the Second Circuit found that the active supervision requirement was satisfied where Connecticut had structured "a detailed mechanism for determining prices," which required that prices not be below wholesaler's cost, and cost was defined to include actual cost, transportation charges, insurance and a minimum markup. *Morgan*, 664 F.2d at 354, 355. Similarly, in *Woolen v. Surtran Taxicabs, Inc.*, 801 F.2d 159 (5th Cir.1986), the Fifth Circuit found the active supervision prong satis-

fied where the details of an exclusive contract for taxicab service at the Dallas/Fort Worth Regional Airport were set forth comprehensively in contracts between the airport board and the taxicab company to whom the board granted exclusive rights. *See Woolen,* 801 F.2d at 164; *cf. Zimomra v. Alamo Rent–A–Car, Inc.,* 111 F.3d 1495 (10th Cir.), *cert. denied,* 522 U.S. 948, 118 S.Ct. 365, 139 L.Ed.2d 284 (1997) (holding that active supervision unnecessary where challenged ordinance left defendants, car rental companies at Denver International Airport, virtually no discretionary authority in setting and collecting usage fees from their customers because usage fee determined by detailed formula).

■ This Court finds that, as in *Morgan, Woolen,* and *Zimomra,* a detailed structure governs the challenged anticompetitive conduct. The Agreement between American and the Ports Authority sets forth a detailed formula for annually adjusting the FIS Facility fee. Pursuant to this formula, American has virtually no discretion in the establishment of the fee. Moreover, a mechanism exists by which the Ports Authority can monitor the data used by American in fixing the fee. Even if the Ports Authority has not reviewed the reasonableness of the FIS Facility fee pursuant to P.R.Laws Ann. tit. 23, § 336(*l*), the Agreement itself specifies two additional mechanisms for reviewing the reasonableness of the FIS fee. COPA has not alleged that the Ports Authority failed to pursue those mechanisms set forth in the Agreement for reviewing the reasonableness of the FIS fee. Thus, the active supervision prong is satisfied in this case.

Both prongs of the *Midcal* test for antitrust immunity have been satisfied. It therefore follows that American enjoys antitrust immunity. The Court notes, however, that the Ports Authority has the responsibility to exercise oversight in American's levying of the FIS Facility fee by, for example, examining the data submitted in the monthly reports and periodically ordering an independent audit. COPA does not contend that the Ports Authority has failed to exercise its supervisory responsibility; rather, it contends that it lacks sufficient powers to exercise real supervision over the adjustment of the FIS fee. Because the Court finds that the Agreement belies COPA's contention, it finds for American.

## IV. THE NOERR–PENNINGTON DOCTRINE

American raises the defense of the Noerr–Pennington doctrine to the extent that COPA alleges that American engaged in unlawful monopolistic conduct by obtaining or influencing legislative, executive, judicial or administrative action. COPA assures the Court, however, that it does not allege the type of unlawful monopolistic conduct for which the Noerr–Pennington doctrine can provide immunity. "The Noerr–Pennington Doctrine is clearly inapplicable to the facts of the case at bar, inasmuch as this case does not have anything to do with efforts, bona fide or otherwise, by American to obtain or influence legislative, executive, judicial or administrative action...." *Id.* at 21. Thus, by COPA's own admission, it does not allege unlawful monopolistic conduct for any attempts that American may have made to obtain or influence legislative, executive, judicial or administrative action. American's defense of Noerr–Pennington immunity is therefore inapposite.

The Court's holding on the issue of state action immunity and COPA's admission with respect to Noerr–Pennington immunity disposes of COPA's antitrust claims. It is unnecessary, therefore, to address the remaining antitrust defenses raised by American.

## V. CONCLUSION

In view of the foregoing, the Court hereby **GRANTS** American's Motion to Dismiss, and **ENTERS JUDGMENT, DIS-**

MISSING COPA's antitrust counterclaims against American.

IT IS SO ORDERED.